## S16A1083. SHAH v. THE STATE.
(793 SE2d 81)

NAHMIAS, Justice.

Appellant Jessica Shah was found guilty of felony murder and two counts of first degree cruelty to children in connection with the death of her infant daughter, Alejandra. Because the trial court erred in not granting Appellant's request for a jury instruction on reckless conduct as a lesser included offense of first degree cruelty to children, we reverse.[1]

1. (a) Viewed in the light most favorable to the verdicts, the evidence at trial showed the following. In 2011, Appellant lived in a rented house in Columbus, Georgia, with her five children: Alejandra, a two-year-old son, an eight-year-old son, a ten-year-old son, and a 14-year-old daughter. Alejandra was born on December 5, 2010, about 13 weeks premature. Because of her extreme prematurity, Alejandra had to stay in the hospital for almost eight weeks. According to Appellant, during this stay, she visited Alejandra about twice a day, but hospital staff testified that Appellant was never there in the mornings when the pediatrician, pharmacist, respiratory therapist, nutritionist, and lactation specialist made their rounds and visited Alejandra.

Alejandra's discharge instructions show that the pediatrician told Appellant to feed Alejandra whenever she was hungry, rather than on a specific feeding schedule. Because of her low birth weight, Alejandra was given Neosure formula, a high-calorie formula for premature infants. Alejandra's father, Captain Enrique Molina, is a registered nurse in the Army; he did not live with Appellant, but he watched Alejandra and the two-year-old boy, his other child with

---

[1] The victim died on the night of July 31 or early morning of August 1, 2011. On April 24, 2012, a Muscogee County grand jury indicted Appellant for three counts of cruelty to children. On November 2, 2012, Appellant was re-indicted, this time for felony murder based on "cruelty to children in the first degree – deprivation," cruelty to children in the first degree by "willfullly depriv[ing the] child of necessary sustenance to the extent that [her] health and well-being w[ere] jeopardized," and cruelty to children in the first degree by "maliciously caus[ing the child] cruel or excessive physical and mental pain by leaving [her] in a hot room for several hours." Appellant was tried from January 7-11, 2013, and the jury found her guilty of all charges. The trial court sentenced her to serve life in prison for felony murder and two concurrent terms of 20 years for the two cruelty to children charges. (As discussed in Division 4 below, the trial court should have merged the cruelty to children based on deprivation count, which served as the predicate for the felony murder count, into the felony murder conviction.) On January 28, 2013, Appellant filed a motion for new trial, which she amended with new counsel on February 5, 2015. After an evidentiary hearing, the trial court denied the motion on September 17, 2015. Appellant filed a timely notice of appeal, and the case was docketed in this Court for the April 2016 term and submitted for decision on the briefs. We note that while the Attorney General filed a brief on behalf of the State, the Chattahoochee Circuit District Attorney failed to file a brief, even after requesting and receiving an extension of time to do so.

Appellant, on most weekends. He also helped Appellant with household expenses, including providing the Neosure formula for Alejandra. During the break from school in the summer of 2011, Appellant's 14-year-old daughter, C. P., was primarily responsible for caring for Alejandra, including feeding and changing the infant, while Appellant, who was not employed, took primary responsibility for the care of the two-year-old boy. C. P., who has attention deficit disorder, testified that she enjoyed caring for Alejandra because she was excited to have a sister.

At some point during the week of July 24, 2011, the air conditioner in the house broke. The outside daily temperatures were over 90 degrees Fahrenheit, and the house's windows were sealed shut. Appellant's landlord was out of town but promised to repair the air conditioner when he returned. In the interim, Appellant purchased a small backyard pool for her children to use to cool off during the day. On Sunday, July 31, Appellant checked on Alejandra around 7:00 p.m. and C. P. fed Alejandra around 8:00 p.m. Around midnight, C. P. gave Alejandra her last bottle for the night and put her to sleep in the car seat in the crib that she usually slept in, because she would cry if put directly in the crib. Around 10:00 the next morning, Appellant received a call from her landlord saying that he would come to repair the air conditioner that day. Appellant woke C. P. and asked her to check on Alejandra and feed her if she cried while Appellant went to the bank to withdraw money for rent, which was due that day. Instead, C. P. fell back asleep.

When Appellant returned from the bank, she stayed outside the house with the landlord until he left some time around 1:00 p.m. Shortly after that, Appellant asked C. P. if she had checked on the baby yet; C. P. said she had not, went to the room where Alejandra was sleeping, and found Alejandra dead. C. P. cried out, and Appellant came to see what was wrong. At that point, it had been about 18 hours since Appellant had last seen Alejandra. Appellant called 911 at 1:20 p.m. and began CPR, but she could not revive Alejandra. Responding officers found Alejandra lying on the floor with a blanket covering her and wearing a long necklace.

(b) At trial, Dr. Stacey Desamours, the GBI medical examiner who performed an autopsy on Alejandra, testified that the child died of dehydration and probable hyperthermia. Alejandra exhibited many signs of dehydration, including high sodium levels in her vitreous eye fluid, sunken eyes, dry lips, and poor skin turgor. Dr. Desamours testified that dehydration in a premature baby in an overheated house would develop over many hours to days, and the most visible symptoms would be fussiness and decreased urine output. She also explained that severe dehydration can cause a child to lose 10 to 15%

of her body weight in water. The doctor noted that Alejandra's premature birth increased her risk for hyperthermia, and this risk was further increased by the fact that she was covered by a blanket in a house without air conditioning. Based on the contents of the child's stomach, Dr. Desamours estimated that Alejandra was fed two to three hours before she died.[2] The doctor also noted post-mortem insect bites from roaches or ants on Alejandra. Because she did not see any evidence of intentional injury, the State's medical examiner concluded that the death was accidental.

The State also called three pediatricians to testify: Dr. Maurice Chen, one of the neonatologists who treated Alejandra when she was hospitalized after her birth; Dr. Joseph Zanga, the supervisor of the residents who saw Alejandra at her post-discharge check-ups; and Dr. Aref Rafsanjani, one of the residents who saw Alejandra at some of her post-discharge check-ups. The State also introduced some of Alejandra's medical records, including notes from her check-up visits at the pediatrician's office and at the WIC (Women, Infants, and Children program) office. The records and doctors' testimony showed that Alejandra weighed 1 pound, 14.4 ounces at birth and 4 pounds, 8 ounces when she was discharged from the hospital on January 28, 2011. When she visited the doctor on February 8, she weighed 4 pounds, 10.6 ounces; on April 11, she weighed 8 pounds, 4 ounces; and on May 9, she weighed 9 pounds, 4 ounces. She missed her scheduled appointments for June 10 and July 7. At the time of her autopsy on August 2, she weighed 9 pounds, 4.8 ounces.

Based on these data, Dr. Chen and Dr. Zanga created charts of Alejandra's growth. The doctors' charts were not included in the discovery materials given to Appellant before trial. Instead, the State disclosed Dr. Chen's growth chart for the first time on the morning of January 9, 2013, the third day of trial and the day Dr. Chen was called to testify. The prosecutor explained to the trial court that she received the chart by e-mail on January 7, but did not realize it was something new so did not open it until the night of January 8, when she called Dr. Chen to ensure that he was ready to testify and he mentioned the chart. The prosecutor then told the court and Appellant that with this new information from Dr. Chen, she had two doctors (Dr. Chen and Dr. Zanga) who were going to testify that Alejandra had been starved for over two months and that Appellant should have noticed Alejandra's lack of growth. Appellant's counsel took issue with the late

---

[2] Along with the testimony regarding Alejandra's last feeding, this testimony put the time of death in the early morning hours, around 2:00 or 3:00 a.m., which was about seven or eight hours after Appellant last checked on her.

disclosure of this new evidence, but did not raise a formal objection. Counsel noted that this new evidence of alleged gradual starvation was being presented after the medical examiner had already testified, so he could not question her about that theory. The trial court gave Appellant an extended lunch break to allow her counsel to talk to Dr. Chen. When Dr. Chen testified, his growth chart was allowed to be used as a demonstrative aid but was not admitted into evidence. Appellant's counsel did not object to Dr. Zanga's chart, which was also allowed as demonstrative evidence.

Based on the medical records and his growth chart, Dr. Chen testified that between Alejandra's discharge and her February check-up, she gained 35 grams per day; between the February and April check-ups, she gained 30 grams per day; and between the April and May check-ups, she gained 9.4 grams per day. Between the May check-up and her autopsy in August, she had gained only 0.3 grams per day. Dr. Chen opined that Alejandra should have been gaining 20 to 30 grams per day, and that because she did not have any other documented medical problems, this lack of growth could only be caused by Appellant starving Alejandra. Dr. Chen also said that this lack of growth would have been apparent to the child's caregiver.

Dr. Zanga testified that according to his growth chart, Alejandra should have weighed between 12.5 and 13.5 pounds at the time of her death; she weighed 25% less than that. He too opined that the only explanation for Alejandra's lack of growth in the last months of her life was starvation and that Appellant should have noticed the lack of growth, particularly because Alejandra would have been producing fewer dirty diapers and would have cried and screamed from hunger and discomfort. Dr. Zanga disagreed with the medical examiner's conclusion that the child's death was accidental, and opined that acute dehydration over the roughly 18 hours when Appellant did not check on Alejandra could not have caused the 25% gap between what she weighed and what she should have weighed. Dr. Rafsanjani testified that on Alejandra's February 8 visit, her weight was appropriate for her gestational age, and between her February and April visits she had grown well.

Doctors Chen and Rafsanjani also testified about the feeding instructions they gave to Appellant. Dr. Chen testified that he encourages parents to feed premature infants whenever they cry. Dr. Rafsanjani testified that he told Appellant to feed Alejandra three to four ounces of Neosure formula every three to four hours, not just when she cried, for a total of twenty-four ounces a day. He explained that a more than 12-hour gap between feedings was not reasonable

for an infant like Alejandra. Dr. Rafsanjani also testified that at seven months old, babies should begin to have some soft food to supplement their formula.

The only witness the defense called was Appellant, who testified as follows. Alejandra slept a lot, including regularly sleeping through the night, and seemed to be growing fine. In the week before her death, Alejandra sounded like she was struggling to breathe, so Appellant made her a doctor's appointment for August 6, but the baby did not appear to be in immediate danger. When Alejandra first came home from the hospital, Appellant would feed her every three to four hours. As Alejandra got bigger, Appellant or C. P. would feed her as much as possible whenever she cried, and in June and July, they increased the amount of formula they were giving her at each feeding; two weeks before her death, they were giving her eight ounces at a time. They also started adding rice cereal to the formula as one of Alejandra's doctors had instructed. On the night of her death, the baby cried twice and both times C. P. gave her a bottle; she drank one full eight-ounce bottle but just a little of a second. Alejandra always slept with her security blanket and always wore the necklace that her father gave her because it is common in his culture for babies to wear necklaces like that.

In closing argument, the prosecutor argued that Alejandra died because Appellant willfully deprived her of formula on July 31 and August 1 and that the evidence of Appellant's gradual starvation of Alejandra during the previous months should be viewed as showing Appellant's course of conduct, meaning that her failure to feed Alejandra on the night of her death was not an accident. Appellant's counsel argued that she had not intentionally harmed Alejandra and that the baby's death was accidental, as the State's medical examiner had concluded. Appellant's counsel told the jury that the testimony that Alejandra was gradually and intentionally starved was "junk science" that was presented by the State as a surprise attack so he would not have a chance to rebut it, and he noted that this testimony conflicted with the medical examiner's conclusion. He also argued that the jury could assume that if Alejandra was showing signs of starvation, her nurse father would have done something. The jury found Appellant guilty as charged.

(c) As a matter of constitutional due process, the evidence presented at trial and summarized above was, when viewed in the light most favorable to the verdicts, legally sufficient to authorize a rational jury to find Appellant guilty beyond a reasonable doubt of the crimes for which she was convicted. See *Jackson v. Virginia*, 443 U. S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979). See also *Vega v. State*, 285 Ga. 32, 33 (673 SE2d 223) (2009) (" 'It was for the jury to determine

the credibility of the witnesses and to resolve any conflicts or inconsistencies in the evidence.' " (citation omitted)). Thus, although we reverse Appellant's convictions based on a jury instruction error, the State may retry her if it so chooses. See *State v. Caffee*, 291 Ga. 31, 34 (728 SE2d 171) (2012).

2. At trial, Appellant submitted a written request for a jury instruction on reckless conduct as a lesser included offense of the cruelty to children charges. In the first degree child cruelty counts of the indictment, Appellant was charged with "willfully depriv[ing the] child of necessary sustenance to the extent that [her] health and well-being w[ere] jeopardized," a violation of OCGA § 16-5-70 (a), and "maliciously caus[ing the child] cruel or excessive physical and mental pain by leaving [her] in a hot room for several hours," a violation of OCGA § 16-5-70 (b). Both of those offenses are felonies. Under the reckless conduct statute:

> A person who causes bodily harm to or endangers the bodily safety of another person by consciously disregarding a substantial and unjustifiable risk that his act or omission will cause harm or endanger the safety of the other person and the disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation is guilty of a misdemeanor.

OCGA § 16-5-60 (b).

This Court has explained that "reckless conduct may be a lesser included offense of cruelty to children," if the harm to the child resulted from criminal negligence rather than malicious or willful conduct. *Banta v. State*, 282 Ga. 392, 397 (651 SE2d 21) (2007). See also *Brady v. State*, 246 Ga. App. 412, 412 (541 SE2d 396) (2000) (noting that the appellant was convicted of reckless conduct as a lesser included offense of child cruelty); *Hill v. State*, 243 Ga. App. 614, 616 (533 SE2d 779) (2000) (same). We have also explained that " '[a] written request to charge a lesser included offense must always be given if there is any evidence that the defendant is guilty of the lesser included offense.' " *Seabolt v. Norris*, 298 Ga. 583, 585 (783 SE2d 913) (2016) (citation omitted). The trial court in this case declined to give a reckless conduct instruction as Appellant requested, accepting the State's argument that the charge was not supported by any evidence. That ruling was erroneous.[3]

---

[3] We note that another lesser included offense of first degree child cruelty for maliciously causing cruel or excessive physical or mental pain is second degree child cruelty for causing

(a) In arguing that a reckless conduct instruction was not required, the State relied on the decisions in *Banta*; *Bostic v. State*, 284 Ga. 864 (672 SE2d 630) (2009); and *Allen v. State*, 247 Ga. App. 10 (543 SE2d 45) (2000). Those child cruelty cases all involved allegations that the defendant physically abused the victim child. In *Banta*, the evidence showed either that the defendant severely beat the child and then intentionally failed to procure medical care for her as she aspirated her own vomit for at least two hours, or that the victim was fine until immediately before the defendant called 911. See 282 Ga. at 398. Similarly, in *Bostic* and *Allen*, the evidence showed that either the defendant severely and violently shook the child (*Bostic*) or hit and bit the child (*Allen*), or that the defendant committed no crime at all. See *Bostic*, 284 Ga. at 866; *Allen*, 247 Ga. App. at 14-15.

No instruction on reckless conduct as a lesser included offense was required in these "all or nothing" cases, in which there was no evidence to support a finding of an intermediate level of culpability — that the defendant harmed the child but did so only through criminal negligence. The State contends that these physical abuse cases are similar to this case, asserting that evidence at trial showed either that Appellant willfully deprived Alejandra of food (intentionally ignoring her cries and lack of weight gain) and maliciously left her unattended in a hot room for many hours, or that Appellant did nothing wrong, because under Appellant's version of the facts, Alejandra was fed as instructed, was growing fine, and did not show any signs of dehydration before her death.

The State ignores, however, the substantial and uncontradicted evidence that Appellant left Alejandra in C. P.'s primary care during the summer, and in C. P.'s almost exclusive care during the hours leading up to the infant's death. Both Appellant and C. P. testified that C. P. usually played with Alejandra, changed her diapers, mixed her formula, fed her when she cried, and otherwise tended to her needs. There was evidence that on the night Alejandra died, Appellant did not personally check on the infant after 7:00 p.m., again relying on C. P. to feed and tend to Alejandra as necessary, and then told C. P. to check on Alejandra around 10:00 the next morning, without checking on the infant herself until after 1:00 p.m. It was possible — and Appellant certainly hoped — that the jury could find from this evidence that she was not criminally culpable at all because she did not willfully fail to provide sustenance to Alejandra and did

---

such pain through criminal negligence. See OCGA § 16-5-70 (c); *Webb v. State*, 300 Ga. App. 611, 611 (685 SE2d 498) (2009). But that crime is still a felony (albeit one with a lower sentencing range), and there is no similar second degree child cruelty for deprivation of sustenance, so it makes sense that Appellant would ask only for a charge on reckless conduct.

not maliciously cause Alejandra pain by leaving her in a hot room, but rather believed that C. P. was appropriately feeding and checking on Alejandra.

However, particularly in light of the extreme heat in the house and Alejandra's fragile condition as an infant born very prematurely, it was also possible, and perhaps more likely, that the jury could make a less exculpatory finding. It could find that even if Appellant did not intend to harm her baby, the routine and complete reliance of Appellant, as the only adult in the home, on C. P., who was only 14 years old and had attention deficit disorder, to be Alejandra's primary caregiver throughout the summer — and sole caregiver for the hours before the baby's death — qualified as "consciously disregarding a substantial and unjustifiable risk" that the baby would not be properly fed and adequately monitored, and this disregard constituted "a gross deviation from the standard of care which a reasonable person would exercise" when responsible for an unusually fragile infant in a dangerous situation. OCGA § 16-5-60 (b). See, e.g., *Baker v. State*, 280 Ga. 822, 822-823 (633 SE2d 541) (2006) (affirming a reckless conduct conviction based on the defendant's leaving his nine-month-old and three-year-old sons unsupervised on the upper floor of a two-story home near an unprotected flight of stairs); *Reyes v. State*, 242 Ga. App. 170, 173 (529 SE2d 192) (2000) (affirming a reckless conduct conviction where the defendant let her three-year-old daughter wander down the road unsupervised, where the child was attacked by an animal). Thus, unlike the child cruelty cases cited by the State, this was not an all or nothing situation. Because there was evidence to support a jury instruction on reckless conduct, the trial court erred in not giving such a charge when Appellant requested it. See *Seabolt*, 298 Ga. at 585.

(b) We must next consider whether this instructional error was harmless. " 'The test for determining nonconstitutional harmless error is whether it is highly probable that the error did not contribute to the verdict.' " *Peoples v. State*, 295 Ga. 44, 55 (757 SE2d 646) (2014) (citation omitted). We conclude that the error was harmful.

The State argues that a reckless conduct instruction would have been wholly inconsistent with Appellant's defense theory at trial. We disagree. Appellant's main defense theory was accident — lack of any criminal mens rea — and the jury was instructed on that theory. See OCGA § 16-2-2 ("A person shall not be found guilty of any crime committed by misfortune or accident where it satisfactorily appears there was no criminal scheme or undertaking, intention, or criminal negligence."). But accident was not the only alternative to felony convictions that Appellant sought to offer at trial.

In his opening statement, Appellant's counsel told the jury that the evidence would show that Appellant's conduct was certainly not intentional, and he suggested that Appellant's reliance on C. P. to care for the infant was not criminally culpable. He acknowledged, however, that in considering all of the circumstances leading to Alejandra's death, the jury might find that Appellant's conduct had been reckless. The State objected to the mention of recklessness on the ground that Appellant had not been charged with reckless conduct, but the trial court allowed Appellant's counsel to continue. As discussed above, Appellant's counsel then elicited evidence that could be used to prove reckless conduct — Appellant's reliance on C. P. to care for the vulnerable Alejandra in dangerous circumstances. Appellant's counsel focused on the accident theory in his closing argument, but that was because the trial court had erroneously refused to give a reckless conduct instruction.

There was some tension between the theory that Appellant committed no crime and the theory that she acted with criminal negligence, but either position was much better for her than a finding that she acted with malice and willfulness. Indeed, criminal defendants often offer dissonant defense theories, particularly with regard to levels of criminal intent when the result of the defendant's actions was undeniably tragic and the jury may be inclined against finding the defendant entirely innocent. A defendant may strategically decide not to rest her case on a single defense theory, and if the evidence supports alternative theories, neither the State nor the trial court is authorized to preclude the jury from considering them. See, e.g., *Webb v. State*, 284 Ga. 122, 126 (663 SE2d 690) (2008) (explaining that the defendant was entitled to a charge on both justification and voluntary manslaughter where both were supported by slight evidence, and reversing his murder conviction because the voluntary manslaughter charge was not given); *Turner v. State*, 262 Ga. 359, 361 (418 SE2d 52) (1992) (explaining that the trial court does not have discretion to force the defendant to choose between an accident and self-defense instruction if both are supported by the evidence).

In this case, defense counsel attempted to blur the line between Appellant's innocent inattention and criminal negligence in caring for Alejandra and to present both accident and reckless conduct as alternatives to the State's theory that Appellant willfully and maliciously harmed the child. That was not an unreasonable strategy. The trial court's refusal to give a reckless conduct instruction deprived Appellant of the benefit of one of her defense theories — maybe the stronger one — and thus deprived her of the chance for the jury to convict her of misdemeanors rather than felonies based on the child cruelty allegations.

The evidence that Appellant left C. P. in charge of Alejandra's feeding and care was uncontradicted, and the evidence that Appellant willfully deprived Alejandra of sustenance and maliciously let her suffer in a hot room was not overwhelming. Accordingly, we cannot say that the trial court's failure to instruct the jury on reckless conduct was harmless, and we therefore reverse Appellant's child cruelty convictions. See *Curtis v. State*, 310 Ga. App. 782, 786-787 (714 SE2d 666) (2011) (holding that the failure to give a lesser included jury charge was not harmless when the evidence of the greater charge was not overwhelming); *Hill v. State*, 300 Ga. App. 210, 212-213 (684 SE2d 356) (2009) (reversing convictions where the trial court refused to give jury instructions on the inconsistent defenses and the evidence of guilt was not overwhelming). We must also reverse Appellant's conviction for felony murder based on first degree child cruelty. If a properly instructed jury concluded that Appellant committed the misdemeanor of reckless conduct instead of the charged felony of cruelty to children based on deprivation, the jury could not rationally conclude that Appellant was guilty of felony murder predicated on the same alleged cruelty to children felony.

3. Appellant also contends that her trial counsel provided constitutionally ineffective assistance in three respects. First, she argues that trial counsel performed deficiently in failing to request an instruction on involuntary manslaughter based on reckless conduct as a lesser included offense of felony murder because, as discussed in Division 2, there was evidence that Appellant committed the misdemeanor of reckless conduct and that it was this conduct that led to Alejandra's death.[4] Second, Appellant argues that her trial counsel performed deficiently in failing to properly object to the growth charts that were not disclosed by the State until the third day of trial. Finally, she argues that once the State introduced the growth charts and the related testimony of Doctors Chen and Zanga to support the theory that Appellant intentionally starved Alejandra for months before her death, trial counsel performed deficiently in not calling three available witnesses who would have persuasively refuted that theory: Enrique Molina, who was Alejandra's father, a registered

---

[4] "A person commits the offense of involuntary manslaughter in the commission of an unlawful act when he causes the death of another human being without any intention to do so by the commission of an unlawful act other than a felony. . . ." OCGA § 16-5-3 (a). Trial counsel testified at the motion for new trial hearing that he did not request this instruction because it "just never occurred to [him]" that involuntary manslaughter could be a lesser included offense of felony murder based on cruelty to children. That was simply a misunderstanding of the law. See, e.g., *Drake v. State*, 288 Ga. 131, 133-134 (702 SE2d 161) (2010) (discussing involuntary manslaughter based on misdemeanor reckless conduct as a lesser included offense of felony murder based on cruelty to children).

nurse, and an Army officer; Dr. Ron Smith, an expert in pediatrics; and Dr. Stacey Desamours, the GBI medical examiner.[5] Because we reverse Appellant's convictions based on the trial court's instructional error, we need not resolve these troubling ineffective assistance claims, which we presume will not recur if the State elects to retry Appellant.

4. In her final enumeration of error, Appellant contends that the trial court erred in failing to merge the guilty verdict for the count of first degree cruelty to children based on deprivation into the felony murder conviction based on that felony. The State correctly concedes that this was error. See, e.g., *Johnson v. State*, 254 Ga. 591, 596 (331 SE2d 578) (1985). If Appellant is again tried and found guilty of any crimes, however, we assume that the trial court will sentence her correctly.

*Judgment reversed. All the Justices concur.*

DECIDED OCTOBER 31, 2016.

*Katherine L. Dodd*, for appellant.

*Julia F. Slater, District Attorney, Robert B. Bickerstaff II, Assistant District Attorney; Samuel S. Olens, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Jason M. Rea, Assistant Attorney General*, for appellee.

---

[5] All three of these witnesses testified at the motion for new trial hearing. Captain Molina, who cared for Alejandra on most weekends, testified that he did not notice anything wrong with her appetite or weight in the months preceding her death. Dr. Smith testified that the growth chart used by Dr. Chen was misleading; that Alejandra was already falling behind in growth rate by the time of her April check-up; that Doctors Rafsanjani and Zanga underestimated Alejandra's caloric needs in advising Appellant on how much to feed her, which caused the infant's growth to flatline; that premature babies are at a higher risk of suffering from failure to thrive, meaning they stop growing; that it is common for parents not to realize that their child is failing to thrive because the baby will act normally in all other respects; and that there is no way to know what Alejandra weighed before she was dehydrated. Finally, Dr. Desamours, who testified as an expert for the State at trial but was not asked to testify for Appellant in rebuttal, explained that she disagreed with the conclusion of the State's other expert witnesses that Alejandra must have died from intentional starvation, particularly because the evidence clearly showed that she was dehydrated and indicated probable hyperthermia. She acknowledged that Alejandra was clearly undernourished, but testified that there was no way of determining from the evidence that this undernourishment was caused by intentional starvation.