306 Ga. 800
FINAL COPY

S19A0866.  HILLS v. THE STATE.

BOGGS, Justice.

Roman Eugene Hills was convicted of malice murder in connection with the 2014 strangulation, beating, and stabbing death of his live-in girlfriend, Beverly Jones. He appeals, asserting error in the trial court's exclusion of a defense witness' testimony and two instances of ineffective assistance of trial counsel. For the reasons stated below, we affirm.[1]

1. Construed in the light most favorable to the jury's verdicts,

[1] The crimes occurred on the morning of November 1, 2014. A Chatham County grand jury indicted Hills for malice murder, felony murder, and three counts of family violence aggravated assault. Hills was tried before a jury from June 30 to July 1, 2016, and was found guilty on all counts. On August 3, 2016, the trial court sentenced Hills to serve life in prison without parole for malice murder. The felony murder count was vacated by operation of law, and the aggravated assault counts merged into the malice murder conviction. On August 4, 2016, Hills filed a motion for new trial, which he amended with new counsel on January 12 and March 17, 2018. After a hearing on October 17, 2018, the trial court denied the motion on January 17, 2019. Hills filed a timely notice of appeal, and the case was docketed in this Court for the April 2019 term and submitted for decision on the briefs.

the evidence showed that at about 8:30 a.m. on November 1, 2014, paramedics responded to a 911 call that someone had fallen. Hills told one of the paramedics that his "wife" had fallen down the stairs.[2] No one was at the bottom of the stairs, however, and the paramedic saw no blood in the area, no items knocked over, nor any other indication that someone had fallen down the stairs. Hills said that his wife was upstairs and led the paramedics to a bedroom where the victim was lying on the bed. She had extensive head trauma, her head was swollen to almost twice its normal size, she was covered in blood, and she was not breathing. She was "obviously dead" and had been so for some time; her body was cold to the touch. The pillow, bed, walls, floor, and curtains nearby were covered with large amounts of dried blood.

Police officers arrived and on entering the bedroom saw "blood everywhere," but noticed no blood on the stairs or on the floors downstairs.[3] Hills was "ranting" at the officers, and as they tried to

_____

[2] Hills' older sister testified that Hills and the victim were not married.
[3] During the subsequent investigation, a fluorescent chemical test

calm Hills down to get him out of the house, they saw dried blood on his clothing, sneakers, and hands. Outside, Hills continued yelling, asked if the victim was dead, and said, "I didn't know what was wrong with her. I didn't know if anything was wrong. I pushed her off me," and "I told her to stop but she didn't listen." Hills was so agitated that officers handcuffed him and transported him to police headquarters. After he was detained, Hills called a family member and said that he knew what he did, but must have been asleep when he did it. He also told the police in an interview that the victim was saying, "Help me, help me, I need help," but he pushed her away for ten or fifteen minutes and "hoped that [he] didn't hit her too hard."

Forensic investigators processed the scene, photographing the outside of the house and then going from room to room inside the house photographing the windows and doors to document "whether they were locked or open" and whether "the windows were accessible

---

detected a small amount of blood on the stairs, "so minute that it did not show up to the naked eye," which one forensic investigator testified was transfer from the feet of EMS and police personnel "that had gone up and down" the stairs during the investigation.

from the outside." The front of the house showed no signs of forced entry, and all doors and windows appeared to be locked and undisturbed.[4]

At trial, the medical examiner testified that the cause of the victim's death was strangulation, with beating and stabbing as significant contributing conditions. The victim had 122 external injuries and 23 internal injuries caused by strangulation, blunt force trauma, and sharp instruments. According to the medical examiner, the injuries were inconsistent with a fall down the stairs. DNA analysis showed the victim's blood on the blade of one pair of scissors, both the victim's and Hills' blood on the blade of a second

---

[4] At trial, one forensic investigator testified that she checked to see if the windows were locked, if the blinds were disturbed, or if any windows were broken, and she did not observe anything out of the ordinary. She also testified that the bedroom contained "a large amount of blood. It was covering the floors, the walls, the ceiling, the curtains, the bed. Pretty much everywhere you looked you saw blood." She concluded that the victim was moving around the room while she was being attacked, not lying in the bed the entire time, and that no one was in the bed with her during the attack, because there was no "void," meaning a part of the bed free from blood because a person or object was lying there at the time of the attack. A police detective testified that "[w]indows were still . . . intact, the amount of blood that was on the scene, if anyone else had went through this, went out the window or something, they would have left blood, transfer on the blinds. They would have knocked things over. Everything was still intact."

pair of scissors, and a mixture of two types of blood, from which Hills and the victim could not be excluded as donors, on the blade of a knife. DNA analysis also showed that the blood on Hills' clothing and hands was the victim's.

Hills testified at trial that he woke from a deep sleep and found the victim lying next to him covered in blood and cold, and that he attempted to wake her and perform CPR before calling for help. He said that he found items of jewelry and the victim's cell phone missing. He also said that on the night before, which was Halloween, he and the victim drank a bottle of wine and then went to a local club for several hours where they danced until the victim said she was ready to go home and told him, "I think one of these hoes put something in your drink. Let's go." They walked home from the club, a mile to a mile-and-a-half.

Hills testified that he believed that "somebody really did put something in my drink," because he felt tired, sweated profusely, and slept very heavily. But he reluctantly acknowledged on cross-examination that he did not tell the police about the missing items

or the victim's alleged statement to him about something being put in his drink. He agreed that he told the police that he was "much more sober" than the victim, and when asked why he did not tell the police that he was "more intoxicated than [his] wife," he responded, "Well, I wasn't intoxicated like that." He was able to walk about a mile-and-a-half from the club to the house without difficulty and speak to a neighbor when he arrived. He also acknowledged that he told the police that he locked the door when he and the victim arrived home and that no one else was there. Finally, he admitted that at some point the victim was crying for someone to call 911, and that he did not do so, claiming that "[s]he'd played like that before."

Though Hills has not challenged the sufficiency of the evidence to support his malice murder conviction, as is this Court's practice in murder cases, we have reviewed the record to determine the legal sufficiency of the evidence. We conclude that the evidence summarized above was more than sufficient to enable a rational trier of fact to conclude beyond a reasonable doubt that Hills was guilty of the crime for which he was convicted. See *Jackson v.*

*Virginia*, 443 U. S. 307, 319 (III) (99 SCt 2781, 61 LE2d 560) (1979).

2. In his first enumeration of error, Hills asserts that the trial court erred by barring testimony from a neighbor that the victim's older son had gained entry into the house on other occasions, which he claims would have impeached through contradiction the police officers' testimony that the house was secure. See OCGA § 24-6-621 ("A witness may be impeached by disproving the facts testified to by the witness."). We review that ruling for clear abuse of discretion. See *Parks v. State*, 300 Ga. 303, 305-306 (2) (794 SE2d 623) (2016).

(a) A few days before trial, the State filed a "Motion in Limine Regarding 'Some Other Dude Did It' Defense."[5] The motion sought to prevent Hills from introducing evidence to suggest that the victim's older son may have murdered her. After jury selection, the trial court heard argument on the State's motion and concluded that evidence that the victim's son entered the house with a key or through a window on a date other than that of the murder did

---

[5] At the hearing on the motion, the parties discussed this unusual style, and the trial court noted that the phrase appears in a legal treatise. See Ronald L. Carlson & Michael Scott Carlson, Carlson on Evidence 95-96 (6th ed. 2018).

nothing more than to cast a bare suspicion or raise a conjectural inference [of the son's guilt], and I think this is exactly what is not appropriate [in light of] . . . the confusion that it would [create] in this case.[6]

The court provisionally granted the State's motion pending the presentation of evidence and forbade Hills from mentioning such a theory in his opening statement.

At trial, outside the presence of the jury, Hills called Carolyn Walker, a neighbor of the victim, to testify. Walker was sworn and said that the victim's son went to the victim's house "the next day right after [the victim] died . . . getting [bicycles] and whatever else that he wanted out [of] the house"; that Walker was "pretty sure he had a key"; and that at some unspecified date "[b]efore any of this happened," Walker had seen him enter the house through a second-story window that could be reached from the porch roof. The trial court excluded the proffered testimony, concluding that the evidence did not connect the son with the corpus delicti, did not clearly point

---

[6] OCGA § 24-4-403 states: "Relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

to someone other than the accused as the perpetrator, and "would have no effect other than to cast a bare suspicion or to raise a conjectural inference as to the commission of a crime by another."[7]

Hills then argued, as an alternative ground for admission, that the proffered testimony would impeach the testimony of police officers that the house was secure when they responded to the scene. The State replied that the proffered testimony could not impeach the officers' testimony that the windows were not accessible on the day of the crime; that the proffered testimony was unclear, because Walker first said she thought the victim's son came in through the window on the day after the murder but then stated that she believed he had a key; and that in any event the proffered testimony was cumulative of Hills' testimony at trial that one window had a faulty lock, that another window did not lock, and that he had

---

[7] See *Roberts v. State*, 305 Ga. 257, 260-261 (3) (824 SE2d 326) (2019) (case decided under new Evidence Code but following general rule under former Evidence Code that "before testimony can be introduced that another person committed the charged crime, the proffered evidence must raise a reasonable inference of the defendant's innocence and, in the absence of a showing that the other person recently committed a crime of the same or similar nature, must directly connect the other person with the corpus delicti.") (Citations and punctuation omitted.)

accessed the house through those two windows in the past. The trial court still refused to admit Walker's testimony. On appeal, Hills argues that the trial court erred in refusing to admit Walker's testimony concerning the victim's son.

(b) Hills relies upon OCGA § 24-6-621[8] and several cases in which trial courts permitted testimony to disprove facts testified to by other witnesses. See, e.g., *Childress v. State*, 266 Ga. 425, 434 (4) (467 SE2d 865) (1996) (holding that defendant could impeach witness who testified that she did not see murder by presenting testimony that witness recounted circumstances of murder to another); *State v. Byrd*, 255 Ga. 665, 667 (341 SE2d 455) (1986) (holding that State could impeach defendant who testified that he had never sold drugs by calling witness who testified that he purchased drugs from defendant).[9] But the cases Hills cites are not

---

[8] "A witness may be impeached by disproving the facts testified to by the witness."

[9] Although the cases Hills cites predate the new Evidence Code, OCGA § 24-6-621 tracks the language of former OCGA § 24-9-82, which has no corresponding provision in the Federal Rules of Evidence as they existed in 2011 when the new Evidence Code was adopted. See generally *Taylor v. State*, 302 Ga. 176, 180 (3) n.5 (805 SE2d 851) (2017).

applicable here, because Walker's proffered testimony did not disprove the facts testified to by the police officers. Walker's statement that she saw the victim's son enter the house, possibly by means of a key, after the victim's death, and that she saw the victim's son enter a window of the house at some unspecified time "[b]efore any of this happened," did not contradict the officers' testimony that the house was secure on the day the victim was killed. As a result, the trial court did not abuse its discretion in excluding the proffered testimony.

3. Hills alleges two instances of ineffective assistance of trial counsel. To prevail on his Sixth Amendment claim of ineffective assistance, Hills must prove both that the performance of his lawyer was professionally deficient and that he was prejudiced by this deficient performance. *Strickland v. Washington,* 466 U. S. 668, 687 (III) (104 SCt 2052, 80 LE2d 674) (1984); *Terry v. State*, 284 Ga. 119, 120 (2) (663 SE2d 704) (2008). To prove deficient performance, Hills must show that his attorney "performed at trial in an objectively unreasonable way considering all the circumstances and in the light

11

of prevailing professional norms." *Romer v. State*, 293 Ga. 339, 344 (3) (745 SE2d 637) (2013). To prove prejudice, Hills "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U. S. at 694 (III) (B). "This burden is a heavy one. [Cit.]" *Young v. State*, 305 Ga. 92, 97 (5) (823 SE2d 774) (2019). And if an appellant fails to show either deficiency or prejudice, this Court need not examine the other prong of the *Strickland* test. See *Palmer v. State*, 303 Ga. 810, 816 (IV) (814 SE2d 718) (2018).

(a) Hills first alleges that his trial counsel was professionally deficient in failing to request a jury instruction on involuntary intoxication. A defense of involuntary intoxication, however, requires that a defendant be so impaired as to "not have sufficient mental capacity to distinguish between right and wrong in relation to such act." OCGA § 16-3-4 (a). See *White v. State*, 263 Ga. 94, 99 (9) (428 SE2d 789) (1993) (holding no error in refusal of involuntary

12

intoxication charge when no evidence of appellant's insufficient mental capacity). Hills presented no persuasive evidence on this point. To the contrary, the evidence presented at trial, including Hills' statements to police and the testimony at trial, tended to show that he was "much more sober" than the victim.

Hills points to his trial testimony that the victim told him that she wanted to leave because she thought someone at the club had put "something" in his drink, and that he believed that to be the case because he felt tired, sweated profusely, and slept heavily. But he did not report the victim's alleged statement or his alleged fatigue or profuse sweating to police when he spoke to them at the crime scene or when they interviewed him after his arrest, even though the police asked him why he left the club. Moreover, his older sister testified that Hills had been a heavy sleeper his entire life, which Hills confirmed on cross-examination. And no persuasive evidence was presented at trial, whether through toxicology reports, medical testimony, or the testimony of patrons of the club or the neighbor to whom Hills spoke when he and the victim arrived home, of Hills'

actual intoxication, much less intoxication sufficient to deprive Hills of his mental capacity to distinguish right from wrong.

Hills' trial counsel testified at the hearing on the motion for new trial that he concluded a charge on involuntary intoxication was inappropriate for several reasons: "[W]e didn't have anything . . . in terms of chemical analysis or anything along those lines . . . . And the defense was that he didn't do it, not that he did it and it was due to involuntary intoxication." Hills asked his trial counsel if he reconsidered that position after the State produced a jailhouse recording of Hills telling a relative, "I know what I did, and I didn't do it consciously because I did it while I was asleep," or after Hills testified that the victim told him that she thought that someone put "something" in his drink. Trial counsel responded, "No. We had set it up one way, and I certainly wouldn't want to abandon the defense halfway through for something that really wasn't – there wasn't any evidence other than his own testimony." On cross-examination, the State asked trial counsel, "What would your opinion as trial counsel be of having [an] I-didn't-do-this defense, as well as but if I did, then

14

. . . it was involuntary." Counsel responded, "You have to do one or the other. . . . If you tell the jury that, I don't think you have any chance of acquittal if you tell them both." The State asked, "And why is that?" and counsel responded, "Because it's not believable."

> [A]n attorney's decision about which defense to present is a question of trial strategy. Unless the choice of strategy is objectively unreasonable, such that no competent trial counsel would have pursued such a course, we will not second-guess counsel's decisions in this regard.

(Citations and punctuation omitted.) *Hendrix v. State*, 298 Ga. 60, 62 (2) (a) (779 SE2d 322) (2015). And "hindsight has no place in an assessment of the performance of trial counsel." (Citations and punctuation omitted.) *Hampton v. State*, 295 Ga. 665, 670 (2) (763 SE2d 467) (2014). Taken out of context, trial counsel's statement that "[y]ou have to do one or the other" could be construed to mean that he erroneously thought that it was not legally permissible to request a jury instruction on inconsistent theories of defense. See *Shah v. State*, 300 Ga. 14, 22 (2) (793 SE2d 81) (2016) ("If the evidence supports alternative theories, neither the State nor the trial court is authorized to preclude the jury from considering

15

them.") (Citations omitted.) It is apparent, however, from counsel's testimony both before and after this statement that counsel meant that he did not think he could make both arguments to the jury and win the case.[10] The trial court found that this was "a tactical decision, based on trial counsel's many years of experience as a criminal defense attorney," which the trial court found to be reasonable. We agree.

(b) Hills also asserts that his trial counsel was professionally deficient with respect to the examination of Kris Rice, the Director of the Coastal Children's Advocacy Center, who interviewed three of the victim's children, aged six years and younger, less than two weeks after the victim was killed. Rice testified that all three of the children said that Hills had hit the victim in the past. On cross-examination, Rice acknowledged that none of the children were

---

[10] This Court also has observed that the assertion of inconsistent theories of defense runs the further risk that the State will seize upon the opportunity to "aggressively point out in closing argument inconsistencies between those theories and the differing view of the evidence that would be required to support each of them. [Cit.]" See V*arner v. State*, 306 Ga. 726, 734 (3) (c) (832 SE2d 792) (2019).

present in the home on the night of the murder and that it was apparent that someone had spoken to the children about their mother's death. Hills' counsel asked Rice if children the ages of the three she interviewed do not always tell the truth, and Rice replied, "I wouldn't say they don't tell the truth. They tell the truth as they understand it." Hills' counsel asked if "the truth as they understand it may not actually be the truth as it is?" and Rice said, "Well, again I think it's a matter of perspective. A child doesn't have the comprehension that an adult does. So in the same circumstance, they may understand and interpret things differently. *But I think in this case, this particular child was an accurate reporter from what she had seen and heard in the past.*" (Emphasis supplied.) When Hills' trial counsel asked, "But you don't have any information to base that on other than what she told you?" Rice replied, "Right. *And my general assessment was that this was a bright articulate child who tried to report honestly what she had seen.*" (Emphasis supplied.)

Hills contends that his trial counsel was professionally

deficient in failing to object to the two italicized statements above as improper comment on the six-year-old child's credibility, as well as in failing to ask the trial court to instruct the jury to disregard these two statements. Pretermitting whether the failure to object and move for an instruction to disregard the statements constituted deficient performance, Hills has failed to show resulting prejudice. The evidence of Hills' guilt as summarized in Division 1 was extremely strong, and the disputed testimony related to past events rather than what occurred on the night the victim died. Thus, Hills has failed to demonstrate a reasonable probability of a different outcome if his counsel had successfully objected to the two challenged statements by Rice and convinced the trial court to instruct the jury to disregard those statements. See *Strickland*, 466 U. S. at 696, 699-700 (V).

*Judgment affirmed. All the Justices concur.*

DECIDED SEPTEMBER 23, 2019.
Murder. Chatham Superior Court. Before Judge Freesemann.
*Robert L. Persse*, for appellant.

18

*Meg E. Heap, District Attorney, Greg McConnell, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Meghan H. Hill, Assistant Attorney General*, for appellee.