**FOURTH DIVISION**
**BARNES, P. J.,**
**RAY, and MCMILLIAN, JJ.**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules/**

**June 29, 2015**

# In the Court of Appeals of Georgia

A15A0675. BUSBY v. THE STATE.

BARNES, Presiding Judge.

A jury convicted Josh Busby of two counts of aggravated battery, aggravated assault, and cruelty to children in the first degree. Following the denial of his motion for new trial, he appeals, arguing that the trial court erred in failing to merge the two aggravated battery charges, and then in failing to merge the aggravated assault charge into the merged battery charges. For the reasons that follow, we affirm.

"On appeal from a criminal conviction, a defendant no longer enjoys the presumption of innocence, and the evidence is viewed in the light most favorable to the guilty verdict." (Punctuation and footnote omitted.) *Hernandez v. State*, 317 Ga. App. 845 (733 SE2d 30) (2012). So viewed, the evidence shows that when Busby and his girlfriend brought their 11-week-old daughter to the emergency room on Saturday, February 9, 2012, the infant had extensive bruises all over her body, her skull was fractured on both sides, and she was having seizures. A physician who was qualified

as an expert in assessing abuse and intentional injury to children testified that the baby had suffered a "massive head injury" and her brain was bruised, bleeding, and swollen. While the fractures would heal, the injury to the brain caused cells to die off, and the physician expected long-term deficits, given all of the baby's injuries, although she could not be tested cognitively until she grew older.

The skull fractures were caused by two separate impacts or were a "stomping injury," and bruising revealed that the baby had been hit on the head at least seven times. The physician thought the baby had been "beaten badly" and could think of no accidental force that would account for all of her injuries. It had required "a lot" of force to cause the skull fractures, which could not have been caused by falling off someone's lap, out of a bassinet, or even down several stairs.

A radiologist who saw the baby at the ER testified for the defense that one of the two fractures in the skull showed some healing and thus had occurred four to seven days previously, but agreed that the injuries could not have been caused by a three-foot fall.

Other evidence established that the baby had been born prematurely and remained in the hospital for about two months. After she was released, Busby, the baby, and the baby's mother lived with the maternal grandparents for two or three

weeks, and on February 1, 2013, they moved to a rental RV or travel trailer that was parked in their landlady's back yard. The maternal grandmother testified that before the February 1 move, the baby had no injuries, bruises, marks, or cuts, but when she saw the baby a few days later, the baby had a "blood bruise" around her eye, that was "real dark red." Busby said the baby's 18-month-old brother had "got ahold to her," and that he had given the boy a whipping for it. The mother's sister testified that when she went to pick up the baby from the back room later that same day, she had a black eye. When the sister asked what happened, the only explanation she got was from Busby, who said, "We left [the baby] back there, [because] we didn't want people to think we were abusing our kids."

The baby's mother, who was indicted on the same charges as Busby but pled guilty to two counts of cruelty to children in the second degree, one for failing to seek prompt medical attention and another for allowing the child to develop severe diaper rash. She testified that she had been taking narcotic medications for chronic health issues and that when she became pregnant unexpectedly her obstetrician sent her to a methadone clinic for treatment. After the baby was born, she testified, she was still in a lot of pain, and Busby interacted more with the children than she did, although they argued daily. She woke to the baby crying a few days after they moved to the

3

travel trailer, and found Busby holding the baby. Busby said, "Look what he done," talking about their son, and the mother saw red marks on the baby's forehead and eyes. She thought their son had flung his pacifier at the baby or something and did not suspect that Busby had done anything.

The mother's cousin testified that the baby had three bruises on her forehead the next day, Thursday, and the corners of her eyes were red, and was told that the baby's brother had gouged the baby's eyes while trying to lift her out of her crib. The next day, Friday, the bruises were lighter and the mother said the baby was okay and did not need to be looked at, but the cousin took a picture of the baby because she was not convinced that the brother had caused the injuries, and "in case anything further happened, there [would be] some sort of evidence that it was not the first time[,] that it had happened before." Busby asked the cousin to delete the photo, but instead she showed him a copy in black and white that did not show the marks as much.

The following day, Saturday, the cousin took the baby home with her and discovered that the baby's head was swollen and "her eyes were locked to the opposite side." She called the mother and told her she needed to come take the baby to the hospital right away because something was wrong, so Busby and the mother

retrieved the baby from the cousin. Busby put the baby in the car and said he was "going to haul ass there" to the hospital, but when the cousin called the hospital, the baby was not there, so she drove to the camper to find the baby lying on the bed with an ice bag on her head.

The mother was "distraught" and crying that the baby needed to go to the hospital, but Busby kept the baby in his arms and kept saying she was going to be okay. Then the baby threw up, and the cousin told Busby that if he did not take the baby to the hospital he would be dealing with a murder case, not just a child abuse case. When the cousin threatened to call 911, Busby finally "got mad," put the baby in the car, and drove her and the mother to the hospital. The cousin followed closely behind, and when they pulled up to the hospital, the cousin grabbed the baby and took her inside while Busby and the mother argued about whether Busby was coming inside or not.

Busby, who was 24, testified that both he and the baby's mother had been addicted to narcotics and had decided to go to a methadone clinic for treatment about a month before the baby was born. They had to pay a fee, speak to a counselor weekly, attend classes, and go to the clinic daily for that day's dose of methadone. The baby was born prematurely with a methadone addiction, which the physician

explained had caused some feeding and growing issues but did not contribute to the later injuries. Once the baby was released from the hospital, the three stayed with the mother's parents until they found the camper to rent. They went to the methadone clinic daily with the mother's cousin and her husband, then ate breakfast at the cousin's house, and then returned to the camper and watched television.

On Wednesday morning, Busby said he and the mother heard a scream and found their son with his hand around the baby's "eye area." When they saw marks or bruises, they "got scared" and took the children to the mother's parents' house and explained what had happened. The mother's mother told them to take the baby to the hospital if things got worse. Then at 6:00 a.m. Saturday, Busby said, he opened the camper door while holding the baby and dropped her down the stairs when he turned to grab his son. He examined her and she was crying but it did not look like anything had "popped," so he did not tell the mother what had happened, he said. He testified that as the day went on, the marks on the baby became more visible, and when he picked the baby up from the cousin's house, he and the mother both decided not to take her to the hospital for reasons he could not articulate, except to say that he had been under the influence of methadone. When he did finally take her to the hospital, he did not tell them he had dropped her out of the front door of the camper.

1. Although Busby does not challenge the sufficiency of the evidence, we find that the evidence as summarized above was sufficient to enable a rational trier of fact to conclude beyond a reasonable doubt that he was guilty of the crimes of which he was convicted. *Jackson v. Virginia*, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979).

2. Busby argues that the trial court erred in failing to merge Counts One and Two, both of which charged him with aggravated battery under the Family Violence Act. The State responds by first asserting that Busby waived his right to argue merger as he conceded as trial that none of the counts merged, and then by contending that it had introduced ample evidence that the baby's injuries were sustained as a result of separate attacks.

(a) As Busby correctly argues in his reply brief, although his trial counsel stated at sentencing that the counts do not merge, the issue is not precluded from appellate review. A defendant may not be legally convicted of a crime that is included as a matter of law or fact in another crime for which the defendant also stands convicted. OCGA § 16-1-7 (a). "[A] judgment of sentence is void where it imposes an illegal sentence, i.e., a sentence that the law does not allow, and … the illegality of such a judgment is not a waivable issue." (Citation omitted.) *Hulett v. State*, 296

7

Ga. 49, 54 (2) (766 SE2d 1) (2014) (sentence in which trial court erroneously merged convictions vacated even though neither party appealed sentencing errors). See also *Wells v. State*, 294 Ga. App. 277, 279 (1) (668 SE2d 881) (2008) ("[F]ollowing a trial, convictions and sentences for offenses which are included in others are void and may not be waived by failure to raise the issue at trial."). Therefore Busby has not waived his right to raise this issue on appeal for failing to raise it in the trial court.

(b) As to the merits of Busby's merger claim, generally, if "one course of conduct violates one criminal statute in several ways described in the statute, a defendant is guilty of only one crime." (Citations omitted.) *Spears v. State*, 296 Ga. 598, 601-602 (2) (769 SE2d 337) (2015). The question, then, is whether Busby committed multiple acts for which multiple sentences may be imposed.

> The question of multiple punishments (as opposed to multiple prosecutions) for the same criminal conduct is addressed under the rubric of substantive double jeopardy. Whether multiple punishment is permissible requires examination of the legislative intent underlying the criminal statute. It is for the legislature to determine to what extent certain criminal conduct has demonstrated more serious criminal interest and damaged society and to what extent it should be punished. Typically, the question is whether the same conduct may be punished under different criminal statutes. In that situation, it is appropriate to apply the "required evidence" test. However, a different question is

8

presented here: whether a course of conduct can result in multiple violations of the same statute. The United States Supreme Court has held that this question requires a determination of the "unit of prosecution," or the precise act or conduct that is being criminalized under the statute. Accordingly, the starting point must be the statute itself.

(Citation, punctuation, and footnotes omitted.) *State v. Marlowe*, 277 Ga. 383, 383-384 (1) (589 SE2d 69) (2003).

Pursuant to OCGA § 16-5-24 (a), "[a] person commits the offense of aggravated battery when he or she maliciously causes bodily harm to another by depriving him or her of a member of his or her body, by rendering a member of his or her body useless, or by seriously disfiguring his or her body or a member thereof." Based on the plain language of the statute, the act or conduct that is prohibited by OCGA § 16-5-24 (a) is "maliciously causing bodily harm to another." Thus, under the facts of this case, each act causing malicious bodily harm to the baby forms a "unit of prosecution" under OCGA § 16-5-24 (a). See *Nosratifard v. State*, 320 Ga. App. 564, 571 (2) (740 SE2d 290) (2013) (each unauthorized act of texting victim in violation of condition of bond order is separate act of aggravated stalking).

Busby was charged in Count One with maliciously causing bodily harm to the baby by rendering her skull useless and was charged in Count Two with maliciously causing bodily harm to the baby by seriously disfiguring her head. If there were no evidence that the battery occurred in a manner other than in a single transaction, with no "deliberate interval" separating any of the blows, only a single verdict for aggravated battery could stand, and these two offenses would merge as a matter of law. Compare *Jeffrey v. State*, 296 Ga. 713, 717-718 (3) (770 SE2d 585) (2015) (holding that four aggravated assault charges based on a single shooting incident merged into one, absent evidence that the shots were fired between deliberate intervals).[1]

---

[1]To explain its holding in *Jeffrey*, the Supreme Court included the following elucidation:

See *Coleman v. State*, 286 Ga. 291, 295 (3) (687 SE2d 427) (2009) ("[w]hen a victim suffers multiple wounds inflicted in quick succession, each infliction of injury does not constitute a separate assault"). Cf. *Thomas v. State*, 292 Ga. 429 (5) (738 SE2d 571) (2013) (aggravated assault with intent to rob does not merge into aggravated assault with a deadly weapon, because each requires proof of an element that the other does not, see OCGA § 16-5-21 (b) (1), (2)); *Jones v. State*, 285 Ga. App. 114 (1) (645 SE2d 602) (2007) (aggravated assault with a knife that occurred downstairs at the victim's house did not merge with aggravated

10

However, the evidence in this case was sufficient for a jury to determine that the baby was battered more than once, in separate incidents. The expert physician testified that after the blow to the baby's head that fractured her skull and caused her brain to swell, the baby would not have acted normally, and both parents testified that the baby was acting normally until the day they finally took her to the ER. Additionally, the expert testified that the swelling caused permanent damage to the baby's brain, thus permanently rendering some brain cells useless. The maternal grandmother testified that she saw marks on the baby's forehead a few days before she was taken to the ER, and the cousin took photographs of the damage to the baby's face the day before she was taken to the ER. Even Busby testified that the marks appeared before he dropped the baby out the front door onto the ground. This evidence is clearly sufficient for a jury to determine beyond a reasonable doubt that the batteries occurred on separate occasions rather than during a single transaction, and therefore the offenses do not merge as a matter of law.

---

assault with a gun that occurred upstairs).

*Jeffrey*, 296 Ga. at 728 (3).

(c) Finally, Busby argues that the trial court erred in failing to merge Count Three, aggravated assault with intent to murder, into the aggravated battery convictions. Count Three charged Busby with the offense of aggravated assault of the baby with the intent to murder her (also alleging the offense was committed between parents and child, which under OCGA § 16-5-21 (k) raises the minimum sentence from one year to three).

When the same act or transaction violates two statutes, we apply the "required evidence" test adopted in *Drinkard v. Walker*, 281 Ga. 211, 217 (636 SE2d 530) (2006), to determine whether one crime is included in the other under OCGA § 16-1-6 (1). "Under the 'required evidence' test … the applicable rule is that where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." (Punctuation and footnote omitted). Id. at 215.

Busby argues that the only distinction between the aggravated battery offenses and the aggravated assault offense is his mens rea, the intent to murder, and that his intent was not an additional "fact," but rather an inference the jury must draw from the evidence. Consistent with his previous enumeration, he contends that the State

12

failed to establish that he committed multiple criminal acts and argued that the same injuries were used to prove both the assault and the battery. We disagree. "[A]ggravated assault with intent to murder required proof of a fact — the intent to kill — that aggravated [battery] did not, and aggravated [battery] required proof of a fact — [the baby's skull was rendered useless and the baby's face was disfigured] — that aggravated assault with intent to murder did not." *Gipson v. State*, ___ Ga. App. ___ (7) (b) (Case No. A15A0155, decided May 6, 2015) (physical precedent only).

The trial court did not err in sentencing Busby separately for aggravated assault with intent to murder, as well as two counts of aggravated battery.

*Judgment affirmed. McMillian, J., concurs. Ray, J., concurs in Divisions 1, 2(a) and 2(b) and in the judgment.*

13