**FIRST DIVISION
BARNES, P. J.,
GOBEIL and MARKLE, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
https://www.gaappeals.us/rules**

*DEADLINES ARE NO LONGER TOLLED IN THIS COURT. ALL FILINGS MUST BE SUBMITTED WITHIN THE TIMES SET BY OUR COURT RULES.*

**June 25, 2021**

# In the Court of Appeals of Georgia

A21A0590. MCDANIEL v. THE STATE.

BARNES, Presiding Judge.

For acts committed upon her nephew, B. F., Christina McDaniel was found guilty of two counts of first degree child cruelty. The trial court imposed upon her two concurrent 20-year sentences, to serve 10 years in prison and the remaining time on probation. Denied a new trial, McDaniel contests in this appeal the sufficiency of the evidence, the admission of hearsay evidence, the absence of certain jury instructions from the final charge, the trial court's refusal to merge the two counts for sentencing purposes, and the court's handling of her request to take judicial notice of a purportedly established fact on motion for new trial. For the reasons explained below, we affirm in part, vacate the sentences, and remand the case for re-sentencing.

1. When an appellant challenges the sufficiency of the evidence, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original.) *Jackson v. Virginia*, 443 U. S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979).

Pursuant to OCGA § 16-5-70 (b), "[a]ny person commits the offense of cruelty to children in the first degree when such person maliciously causes a child under the age of 18 cruel or excessive physical or mental pain." One count of the indictment alleged that "between the 1st day of January, 2018, and the 1st day of May, 2018, the exact date of the offense being unknown," McDaniel "did maliciously cause [B. F.], a child under the age of eighteen (18) years, cruel and excessive pain by tying the victim up in the garage." A second count alleged that "between the 1st day of January, 2018, and the 1st day of May, 2018, the exact date of the offense being unknown," McDaniel "did maliciously cause [B. F.], a child under the age of eighteen (18) years, cruel and excessive physical and mental pain by keeping him in a garage which was not temperature controlled."

At McDaniel's trial, evidence adduced from the State's witnesses showed the following. B. F. and his brother, who was about four years older than B. F., were

removed from their parents' custody when their parents were having drug problems. The boys were placed in the custody of McDaniel, their maternal aunt. Already living at her residence, were McDaniel, her five children, and her husband.

About three years later, on April 26, 2018, when B. F. was nine years old and in the third grade, his classmates alerted their teacher by 8:00 a.m. to look at B. F.'s hands and wrists. Outside the classroom, the teacher asked B. F. to show her his hands; when B. F. pulled up his sleeves, the teacher saw, as she described at trial, the child's swollen hands and the "red marks all over his wrists, and they were really raw." The teacher recounted at trial that "he told me that his aunt had done it to him." The teacher testified that she was aware at the time that McDaniel was B. F.'s guardian, as the aunt had previously come to school lunches.

As a mandatory reporter of suspected child abuse, the teacher notified both the principal and the school counselor of the matter. The counselor spoke to B. F., and the child said that he had gotten "tied up" and left lying on his stomach in the garage. As the counselor described at trial, B. F.'s hands were swollen, his "hands looked severe," and "there were contusions around his wrists." The principal contacted the sheriff's office.

Meanwhile, as the counselor recounted at trial, McDaniel had come to the school for another of her frequent lunches there. The counselor testified that after McDaniel had lunch with B. F. and/or one of her own sons (who was also a student at that school), she sought to check both boys out of school for the day. B. F. was summoned to the counselor's office. But because the counselor and the principal were concerned about B. F.'s going home with McDaniel, the counselor contacted the Department of Family and Children Services ("DFCS"), and the principal called the sheriff's office again. They waited for such help to arrive. As the counselor testified,

> [McDaniel] stayed for a long time because we were basically making her stay, because we weren't sure what to [do] with [B. F.], so she just didn't know anything, she just waited an abnormally long period of time to wait for a child to come from class, and then I eventually went out to talk to her, to say here is sort of what's going on.

Thereafter, officers from the sheriff's office and workers from DFCS responded to the school. A DFCS case worker met with B. F. and observed what she described at trial as "ligature marks on both wrists and . . . his hands were swollen." B. F. disclosed to the case worker that on the night before, he had been tied up by his aunt, McDaniel, who had then left him in the garage to sleep; and that his brother had

4

untied him earlier that morning. The case worker took photographs of B. F.'s wrists and hands, and the photographs were shown to the jury.

The DFCS case worker, together with a DFCS administrator over investigations, interviewed McDaniel for an explanation of how B. F. had sustained the injuries. McDaniel denied ever seeing the marks on B. F.'s wrists, asserting that the marks had not been on the child when he left for school earlier that day. McDaniel gave several possibilities as to how B. F. might have sustained the injuries – he had participated in an "eraser challenge"[1] at school; he had worn a jacket with cuffs that were too tight; and he was taking a new medication and was constantly wringing his wrists.

The DFCS case worker and/or the investigator from the sheriff's office determined that B. F. should undergo a medical examination and that both B. F. and his brother should undergo forensic interviews. DFCS did not have custody of either boy at the time. But McDaniel agreed to drive B. F. to the location where the medical

---

[1] The DFCS administrator explained that, about a year prior, children were "erasing their skin to cause marks on themselves," but that the marks on B. F.'s wrists were not consistent with markings typically resulted from an "eraser challenge." As the DFCS administrator described, "B. F. had significant swelling in his hands and he also had pretty extensive marks around both wrists that kind of flowed in a pattern around the entire wrist."

5

examination would be performed, and arrangements were made for the boys' maternal grandmother to drive B. F.'s brother to a designated location for his forensic interview. According to the investigator from the sheriff's office, after the grandmother picked up B. F.'s brother, she took "quite some time" to arrive with him at the prearranged location.

B. F.'s brother was interviewed that day by a deputy sheriff who was specially trained to conduct forensic interviews. He denied that B. F.'s injuries had been caused by McDaniel, and he stated that B. F. slept in a room inside the home. A recording of that forensic interview was played for the jury.

When B. F. underwent a medical examination that same day at about 4:00, he began retreating from his prior accusations about McDaniel. The examining physician assistant recounted at trial,

> I asked [B. F.] what had happened today at school, to try to approach the subject of the reason he was there. . . . He said he told one of his friends that sometimes his aunt would tie his hands together,[2] but then my

_____

[2] When asked later about this aspect of her testimony, the physician assistant elaborated, "[B. F.] said he had told his friend that sometimes his aunt tied him up, tied his hands behind his back. And then his friend told the teacher, and the friend didn't realize that he had been kidding."

6

friend took me serious, and I was kidding. And his friend told the teacher something.

With respect to B. F.'s wrists, the physician assistant found, among other things, "a generally horizontal line . . . consistent with a binding injury, something tied around it." Based on statements and body demonstrations that B. F. made to her, the physician assistant became concerned that B. F.'s hands had been tied behind his back; while examining the child's back, the physician assistant discovered a small bruise at the lower part of his back near his spine. The physician assistant took photographs of B. F.'s injuries to his hands, wrists, and back; and those photographs were shown to the jury.

The physician assistant testified that when she specifically asked B. F. how he had gotten the marks on his wrists, he answered, "[M]y aunt said this was from the eraser challenge." The physician assistant testified that when she next asked B. F. whether he had been doing the eraser challenge, "[B. F.] laughed at me and said no." The physician assistant testified that when she later spoke with McDaniel, McDaniel offered that B. F. might have participated in an eraser challenge, or perhaps his sleeves had been too tight the day before.

The physician assistant opined that B. F.'s injuries were consistent with B. F.'s having been tied up, and that they were *not* consistent with either of McDaniel's proffered explanations. As the physician assistant summarized at trial, there were ligature marks around B. F.'s wrists, and

> ligature marks are basically something was firmly tied around something. And what I saw, and it might not have been as clear in the photos, but his hands were still swollen and pink from being bound. That's typically from the compression and the blood flow isn't able to move back and forth like it should, so it causes edema there and swelling to the hands.

The next day, B. F. was interviewed by the same deputy sheriff specially trained in conducting forensic interviews. B. F. was asked whether he knew why he was there. Displaying his wrists to the interviewer, he answered that he had jokingly told a schoolmate that his aunt had tied up his wrists, but that his schoolmate had taken him seriously and thus told their teacher. B. F. told the interviewer that the only thing that had been around his wrists was duct tape from when he had been playing cops and robbers. He stated that he had never gone to bed with such tape on his wrists. When asked whether he was disciplined at home, B. F. answered yes, and stated that he would be spanked, made to stand in the corner, or made to sit on the

8

couch. When asked whether he had any secrets, B. F. answered that he had a problem wetting the bed at night. A recording of that forensic interview was played for the jury.

DFCS – having received the examining physician assistant's opinion that B. F's injuries included "ligature marks" a/k/a "binding marks" on the wrists, and further discerning that none of McDaniel's proffered explanations as to how B. F. had received his injuries aligned with the medical findings – procured a shelter care order for B. F. and his brother.[3] The boys were placed with a different maternal aunt. An assigned DFCS foster care case manager thereafter spoke with McDaniel and asked her whether she knew why DFCS had become involved; McDaniel replied that there had been some accusations made and some lies created by B. F. and his brother.

Several days later, on May 2, the deputy sheriff trained to conduct forensic interviews, along with another law enforcement officer, met with McDaniel at the sheriff's office. Again, McDaniel denied having done anything to cause B. F.'s injuries; she denied having any knowledge as to how he had sustained them, although she mentioned that B. F. sometimes wrung his wrists. McDaniel said nothing about

---

[3] It is unclear whether the shelter care order was obtained the same day of B. F.'s medical examination or the following day.

B. F.'s sleeping in the garage, and claimed that B. F. slept in the room with her. She described that when disciplining the children at her residence, she would put them in a corner, take away their electronics, and occasionally spank them. She specifically denied having ever restrained B. F.

But by the following month, B. F. had begun confiding in his custodial aunt that McDaniel had been tying him up and putting him in the garage to sleep. B. F.'s brother also had begun confiding in the custodial aunt that B. F.'s hands were tied behind his back, that his feet were tied together, that B. F. was placed in a garage on a small mattress, and that the other children living at the residence would pick on him as he was bound and confined in the garage. The custodial aunt and the DFCS case worker arranged for B. F. and his brother to undergo second forensic interviews.

On June 4, 2018, the same forensic interviewer met separately with B. F. and his brother. B. F. stated that, prior to his first forensic interview, McDaniel had told him to lie about how his wrists were injured; he claimed that his initial accounts – that McDaniel had caused the injuries – had been the truth. B. F. went on to recount that every night for about a month and a half, McDaniel had made him sleep in the garage. He described that McDaniel had also used clothing items to tie his arms behind his back and to bind his feet; that she sometimes would put duct tape around his arms and

legs; and that she would also cover him with a thick blanket. B. F. recalled, "It was really, really hot in there. No fans or anything. And it was really dark. No one else was in there. And there was no fans or anything and covers covering me. It was burning hot in there. I couldn't barely breathe. I was panting." B. F. described that he thought he would "pass out at any time." B. F. stated that during those nights, he could not get out of the garage, that McDaniel would not allow him to go to a bathroom, that she would put pull-ups on him, and that "I would pee on myself, because I can't hold it." B. F. recalled that on the following mornings, his brother would help him remove the bindings. B. F. was asked how the overnight episodes had made him feel; he replied, "Bad." A recording of B. F.'s second forensic interview was played for the jury.

When B. F.'s brother underwent a second forensic interview, he disclosed that during his first forensic interview, he had not been completely truthful – that his maternal grandmother had instructed him to give only one-word or "yes/no" answers; and that McDaniel had instructed him, during a brief moment on that day, not to discuss that B. F. was being tied up. B. F.'s brother explained in his second interview that based on his religion, he was required to "do what the people over you say"; that he loved McDaniel and did not want to hurt her; that he had been worried about being

11

taken away from McDaniel; and that he did not want to cause McDaniel to lose her own children.

During that second interview, B. F.'s brother told that, about a month before they were taken from McDaniel, she started putting B. F. in the garage to sleep for the night. B. F.'s brother recounted that when McDaniel would leave B. F. in the garage for the night, B. F. would sometimes get out; and so, on about three of four occasions, McDaniel had additionally tied up B. F. He described that B. F. was usually tied up with various pieces of clothing; that his wrists were tied together behind his back; that B. F. was put into shirts with the sleeves tied behind him, resembling a straitjacket constraint; and that B. F. was made to sleep on an air mattress on the garage floor, which was punctured at some point, so B. F. slept on it deflated. As he summarized, "[McDaniel] put him in the garage. And there's no heating or air in there."

B. F.'s brother was asked during his second forensic interview who would eventually untie B. F., and he answered that either he or McDaniel would do so. B. F.'s brother added that during the night, B. F. would "wet himself and . . . go to the bathroom, so it's both ways . . . so . . . they didn't want to deal with the smell, so they made me do it." B. F.'s brother additionally described that B. F. would "pick at his

pull-ups," and that "if he did use the restroom, it would go everywhere." A recording of B. F.'s brother's second forensic interview was played for the jury.

At the trial, both B. F. and his brother took the stand. B. F. was then 10 years old, and testified that while living with McDaniel, he had slept on a mattress in the garage. He described that he sometimes could not move his hands, because McDaniel had tied them with clothes. He was asked at trial, "Were you able to use the bathroom when you were in the garage?" B. F. replied, "Well, it was at night, and I don't think so."

B. F.'s brother was 14 years old at McDaniel's trial. He testified that when he and B. F. were living with McDaniel, B. F. sometimes slept in a bed, but slept in the garage at other times. B. F.'s brother testified that McDaniel told everyone where to sleep.

McDaniel elected not to testify, but called two witnesses. Her first witness was the oldest of her five children. Seventeen years old at the trial, he remembered when B. F. and his brother came to live with his family. Throughout their stay, McDaniel's son testified, B. F. always slept in a room inside the home. McDaniel's son testified that he never saw B. F. tied up, that he never heard his mother tying up B. F., and that he had no knowledge of B. F. being forced to sleep in the garage.

13

McDaniel's second trial witness was her second oldest son. Sixteen years old at the trial, he also remembered when B. F. and his brother came to live with their family. He testified that B. F. always slept in a room inside the house, that he was not aware of any time that his mother had tied up B. F., and that he was not aware of any time that his mother forced B. F. to sleep in the garage.

The jury found McDaniel guilty of two counts of first degree child cruelty as set out above. On appeal, McDaniel argues that because the State did not present evidence of the nightly temperatures for the time span and geographic area, the evidence was insufficient to prove that she "did maliciously cause [B. F.] . . . cruel and excessive physical and mental pain by keeping him in a garage which was not temperature controlled." (Emphasis supplied.) As McDaniel particularly argues, the State's case "lacked evidence of malice with regards to keeping [B. F.] in the garage without temperature control." She asserts that "the temperatures in the area did not exceed seventy degrees during the time period in question. It was not hot, therefore [she] could not have intended nor known that [B. F.] would be so hot that it would cause him extreme mental or physical pain."

McDaniel's challenge is unavailing. A conviction for first degree child cruelty required the State to present "evidence establishing the age of the child, that the child

14

suffered physical *or* mental pain, that the pain was cruel *or* excessive, that the

defendant caused the pain, and that the defendant acted maliciously in so doing."

(Emphasis supplied.) *Brewton v. State*, 266 Ga. 160, 160 (1) (465 SE2d 668) (1996).

> For purposes of [first degree child cruelty], malice in the legal sense,
> imports the absence of all elements of justification or excuse and the
> presence of an actual intent to cause the particular harm produced, *or* the
> wanton and wilful doing of an act with an awareness of a plain and
> strong likelihood that such harm may result. Intention may be manifest
> by the circumstances connected with the perpetration of the offense.
> Intent is a question of fact to be determined upon consideration of
> words, conduct, demeanor, motive, and all other circumstances
> connected with the act for which the accused is prosecuted.
> Consequently, the question of a defendant's mental state and whether
> the child[ ] experienced cruel or excessive physical or mental pain are
> reserved for the jury.

(Footnote omitted; emphasis supplied.) *Kirt v. State*, 309 Ga. App. 227, 233 (4) (709

SE2d 840) (2011).

"We view the evidence on appeal in the light most favorable to the verdict and

no longer presume the defendant is innocent." *Hill v. State*, 243 Ga. App. 614, 614

(533 SE2d 779) (2000). In this case, the evidence authorized the jury to find that

McDaniel told all the household members where to sleep each night; that she forced

B. F. to sleep in the dark garage overnight, while she and all the other household members slept in rooms inside the home; that she covered B. F. with a thick blanket; that McDaniel knew that her garage had no temperature controls; that she knew that B. F. would get out of the garage; that she thus took affirmative steps to ensure that B. F. stayed confined to the garage – firmly binding his wrists behind his back and tying his feet together; that she thus deprived the child of any means to get out of the garage, to make any adjustments to the room temperature, or to adequately cool himself; that while so confined, the child experienced a "burning hot" environment to the extent that his breathing devolved into panting, believed he would "pass out at any time," and generally felt "bad". As noted above,

> Malice [includes] the wanton and willful doing of an act with awareness of a plain and strong likelihood that [cruel or excessive physical or mental pain] may result. The evidence, as outlined above, was legally sufficient to authorize a rational trier of fact to find beyond a reasonable doubt that [McDaniel] . . . act[ed] in a wanton or willful fashion with awareness of a plain and strong likelihood that such harm would result and that such actions caused [B. F.'s cruel or excessive physical or mental pain].

(Citations and punctuation omitted.) *Jones v. State*, 301 Ga. 94, 99 (2) (799 SE2d 749) (2017); see *Kirt*, 309 Ga. App. at 234 (4) (concluding that the evidence –

16

defendant confined 12-year-old child in a bathroom stall against her will, while holding a knife and trying to tear off a piece of duct tape – was sufficient to show that "[the defendant] maliciously intended to cause the child cruel and excessive mental pain"); *Cochran v. State*, 285 Ga. App. 175, 175-176 (645 SE2d 662) (2007) (affirming first degree child cruelty conviction for breaking his baby's arm, where the jury was not required to accept the defendant's version of events, and the evidence authorized the jury to find that he acted with the requisite intent).

2. McDaniel contends that the trial court erred by admitting hearsay. She points out that, over her counsel's objection, the trial court allowed the DFCS case worker to testify, "I received a call from [the counselor], who stated that . . . McDaniel was at the school trying to pick up [B. F.]. And then at that time [the] Sheriff's Department stepped in, so that way it did not happen."

The contested trial court's ruling does not provide a basis for disturbing the judgment. As detailed above, the counselor gave extensive testimony that McDaniel arrived at the school for lunch; that she thereafter sought to check out B. F. and her son from school for the remainder of the day; and that he (the counselor) eventually updated McDaniel about "sort of what's going on," while he continued to await the arrival of law enforcement and DFCS personnel in response to his calls. Additionally,

17

the responding DFCS caseworker and an investigator from the sheriff's office each provided testimony as to his or her respective involvement with B. F. and/or McDaniel upon arriving at the school, which measures thwarted McDaniel's plan to check B. F. out from school for the remainder of the day. Because the contested hearsay testimony was cumulative of other admissible testimony, any error in the trial court's hearsay ruling was harmless. See *Ensslin v. State*, 308 Ga. 462, 471 (2) (d) (841 SE2d 676) (2020) ("Even an error of constitutional magnitude . . . may be considered harmless if the State can prove beyond a reasonable doubt that the error did not contribute to the verdict, such as when the evidence at issue is cumulative of other properly-admitted evidence or when the evidence against the defendant is overwhelming.") (citation and punctuation omitted); *Davis v. State*, 302 Ga. 576, 583-584 (4) (805 SE2d 859) (2017) (determining that even if statement fell outside of hearsay exception, its admission was harmless, because it was merely cumulative of other evidence); *Anglin v. State*, 302 Ga. 333, 336 (2) (806 SE2d 573) (2017) ("[T]he erroneous admission of hearsay is harmless where substantial, cumulative, legally admissible evidence of the same fact is introduced.").

3. McDaniel contends that the trial court erred by rejecting two of her requested jury instructions. The trial transcript shows that no objection was made to the final

charge, so review is for plain error only.[4] See *Vasquez v. State*, 306 Ga. 216, 225 (2) (830 SE2d 143) (2019).

> First, there must be an error or defect — some sort of deviation from a legal rule — that has not been intentionally relinquished or abandoned, i.e., affirmatively waived, by the appellant. Second, the legal error must be clear or obvious, rather than subject to reasonable dispute. Third, the error must have affected the appellant's substantial rights, which in the ordinary case means he must demonstrate that it affected the outcome of the trial court proceedings. Fourth and finally, if the above three prongs are satisfied, the appellate court has the discretion to remedy the error — discretion which ought to be exercised only if the error seriously affects the fairness, integrity, or public reputation of judicial proceedings.

(Citation, punctuation and emphasis omitted.) *State v. Kelly*, 290 Ga. 29, 33 (1) (718 SE2d 232) (2011). "The Court need not analyze all of the elements of the plain error test when the appellant fails to establish one of them." *Hill v. State*, 310 Ga. 180, 194 (11) (a) (850 SE2d 110) (2020).

(a) Citing evidence that B. F. suffered from night terrors and bed-wetting, McDaniel contends that the trial court erred by rejecting her request to instruct the

---

[4] Notably, McDaniel acknowledges in her brief that this issue "will be reviewed for plain error."

19

jury on parental discipline. OCGA § 16-3-20 (3) provides, "The fact that a person's conduct is justified is a defense to prosecution for any crime based on that conduct. The defense of justification can be claimed . . . . [w]hen the person's conduct is the reasonable discipline of a minor by his parent or a person in loco parentis."

McDaniel has not demonstrated plain error, because she has not shown that the absence of jury instructions on that defense likely affected the outcome of her trial. Such a justification defense requires a finding that "the person's conduct is the *reasonable* discipline of a minor." (Emphasis supplied.) OCGA § 13-3-20 (3). "[W]e recognize that what is reasonable discipline may depend, inter alia, upon the age and physical condition of the child." *Marshall v. State*, 276 Ga. 854, 857-858 (6) (a) (583 SE2d 884) (2003).[5] But we find it highly improbable that had the jury been charged on that defense, it would have found that the acts inflicted upon B. F. – tying his hands together behind his back, binding his feet together, covering him with a thick blanket, then abandoning him for the night in a dark garage that had no temperature controls, and thereby (among other things) depriving the 8- to 9-year old child of any

---

[5] See generally *Sims v. State*, 234 Ga. App. 678, 679 (1) (a) (507 SE2d 845) (1998) ("'Cruel' and 'excessive' are adjectives which inherently require a consideration of degree; the law does not set a bright line but leaves to the trier of fact, taking into account societal norms generally accepted, whether certain behavior inflicts 'cruel' or 'excessive' pain[.]").

means to come out of the "burning hot" garage or to make adequate adjustments to cool his body, and further stripping the child of the use of a bathroom – amounted to reasonable parental discipline for the boy's night terrors and/or bed-wetting. See id.; and see, e. g., *Leslie v. State*, 341 Ga. App. 731, 734 (1) (802 SE2d 674) (2017) (noting "the jury's rejection of the [a]ppellant's defense that his actions were justified as reasonable parental discipline," where the appellant, as a means of disciplining his 7-year-old son, had repeatedly forced the child into a wooden box that had no holes for light or air to enter, then latched the box closed for 30 minutes, while the child yelled out that he was hot and could not breathe); *Bearden v. State*, 163 Ga. App. 434, 438 (5) (294 SE2d 667) (1982) (explaining that the trial judge committed no error in failing to charge on parental discipline, because even if the injuries sustained by the minor child were occasioned by appellant's acts of discipline, such conduct could not have been determined to have been *reasonable* discipline). See generally *Snipes v. State*, 309 Ga. 785, 790 (2) (848 SE2d 417) (2020) (finding no plain error, because "it [was] highly probable that any error in refusing the requested charge did not contribute to the jury's verdict"); *Choisnet v. State*, 295 Ga. 568, 572-573 (2) (761 SE2d 322) (2014) (finding no plain error in the trial court's failure to charge the jury

21

on the legal concept of justification, where even with a proper instruction thereon, it was unlikely the jury would have reached a different verdict).[6]

(b) Relying heavily on *Shah v. State*, 300 Ga. 14 (793 SE2d 81) (2016), McDaniel complains that the trial court refused her request to instruct the jury on the misdemeanor crime of reckless conduct,[7] as a lesser included offense of first degree child cruelty.

In *Shah*, the Supreme Court of Georgia reaffirmed that "reckless conduct may be a lesser included offense of cruelty to children, if the harm to the child resulted from criminal negligence rather than malicious or willful conduct." (Punctuation and

---

[6] See *Martin v. State*, 298 Ga. 259, 277-278 (6) (c) (779 SE2d 342) (2015) (equating the third, harm prong of the plain error standard with the prejudice required to establish an ineffective assistance of counsel claim under *Strickland v. Washington*, 466 U. S. 668, 694 (104 SCt 2052, 80 LE2d 674) (1984)), disapproved on other grounds by *Willis v. State*, 304 Ga. 686, 706 (11) (a), n.3 (820 SE2d 640) (2018).

[7] See OCGA § 16-5-60 (b) ("A person who causes bodily harm to or endangers the bodily safety of another person by consciously disregarding a substantial and unjustifiable risk that his act or omission will cause harm or endanger the safety of the other person and the disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation is guilty of a misdemeanor."). See also *Daniels v. State*, 264 Ga. 460, 464 (2) (b) (448 SE2d 185) (1994) ("As a basis for liability, criminal negligence is the reckless disregard of consequences, or a heedless indifference to the rights and safety of others, and a reasonable foresight that injury would probably result.") (citation and punctuation omitted).

citation omitted.) *Shah*, 300 Ga. at 19 (2).[8] In that case, the Supreme Court reversed a mother's first degree child cruelty convictions due to the trial court's refusal to instruct the jury on reckless conduct. Id. at 23 (2) (b). On August 1, 2011, the victim in that case, the mother's 8-month-old baby who had been born 13 weeks premature, was discovered dead in the room where the baby had been sleeping. Id. at 14-15 (1) (a). The GBI medical examiner who performed an autopsy testified that the infant had died of dehydration and probable hyperthermia. Id. at 15 (1) (b). The defense counsel attempted to present reckless conduct as an alternative to the State's theory that the appellant had willfully and maliciously harmed the infant. Id. at 22 (2) (b). Justifying a charge on reckless conduct, the Supreme Court ascertained, was "substantial and uncontradicted evidence that [the mother] left [her infant] in [her 14-year-old child's] primary care during the summer, and in [that teenager's] almost exclusive care during the hours leading up to the [infant's] death." Id. at 20-21 (2) (a). As the Supreme Court concluded, the mother's routine and complete reliance upon her teenager (who

---

[8] See *Stepp-McCommons v. State*, 309 Ga. 400, 404-405 (2) (c) (845 SE2d 643) (2020) (reciting that "reckless conduct is an act of criminal negligence, rather than an intentional act, that causes bodily harm or endangers the bodily safety of another") (citation and punctuation omitted); *Collett v. State*, 305 Ga. 853, 856 (2) (a) (828 SE2d 362) (2019) (same); *Lindsey v. State*, 262 Ga. 665, 666 (2) (b) (424 SE2d 616) (1993) (same).

also had attention deficit disorder) to be the primary caregiver of such a fragile baby in a house with extreme heat constituted requisite evidence of criminal negligence, and not malice, to warrant a charge on reckless conduct. Id. In reaching that conclusion, *Shah* analyzed and distinguished the State's proffered authorities, categorizing them as "'all or nothing' cases, in which there was no evidence to support a finding of an intermediate level of culpability – [that is,] that the defendant harmed the child but did so *only through criminal negligence*." Id. at 20 (2) (a) (emphasis supplied).

Here, there was no evidence that McDaniel had assigned B. F.'s overnight care to anyone else. And at the jury charge conference, McDaniel's lawyer neither cited evidence to support a charge on reckless conduct, nor posited that McDaniel had committed acts of criminal negligence. To the contrary, McDaniel's lawyer told the trial judge that "I don't believe that there was evidence of negligence on behalf of the State's presentation or the Defense's presentation" and that "it wasn't my argument that if [the alleged acts] did happen it was reckless."[9]

---

[9] As the defense counsel elaborated, "The reason why I requested reckless is I believe on Westlaw on the pattern charge of first degree, it said in parentheses – it cites the case *Sha[h] v. State*[, 300 Ga. 14,] . . . that not requesting or not giving reckless could be error. And so that is why I put it in there in my pattern. But I do not – No, it wasn't my argument that if it did happen it was reckless. However, I do think

As for the defense that McDaniel *did* pursue at trial, the evidence makes clear that she steadfastly maintained – to the DFCS case worker and the DFCS administrator over investigations who responded to the school, to the physician assistant who examined B. F., to the DFCS foster care case worker, to the forensic interviewer and fellow law enforcement officer at the sheriff's office, then to the jurors by means of eliciting testimony from her defense witnesses – that she did not contribute to B. F.'s wrist injuries, that she did not restrain the child's limbs, and that she did not confined the boy to her garage overnight.

By contrast, the State's charges of first degree child cruelty were supported by evidence that McDaniel instructed all the members of the household where to sleep at night; that for about a month, McDaniel forced B. F. to sleep alone and overnight on a (sometimes deflated) air mattress in the garage, where it was dark and lacking

that it could be appropriate to put reckless in if Your Honor does choose so as a lesser." (Defense counsel made no attempt at the charge conference, however, to align the instant case with *Shah*, supra. )

Defense counsel went on to explicitly object to the jury being charged on second-degree child cruelty: "I don't believe that there was evidence of criminal negligence that would make second degree relevant for this. So I would object to the lesser being second degree." Defense counsel later stated, "And Your Honor, if Your Honor is inclined to give a lesser and if you decide to give a lesser that it would be second degree, I would withdraw my request for any type of lesser. If that makes sense."

of fans and temperature control; that she was well aware that B. F. would attempt to get out of the garage; that on multiple occasions, in order to ensure that B. F. remained confined to the garage, she firmly tied B. F.'s wrists together behind his back with clothing to restrain him in a "straitjacket" fashion and further bound his feet; that she covered the child with a thick blanket; and that in taking the foregoing measures, McDaniel stripped the child of access to a bathroom, and deprived him of the ability to cool himself as he experienced a "burning hot" environment that caused him to pant, believe he would "pass out at anytime," and generally feel "bad."

Pretermitting whether McDaniel's trial lawyer's statements at the charge conference – "I don't believe that there was evidence of negligence on behalf of the State's presentation or the Defense's presentation" and that "it wasn't my argument that if [the alleged acts] did happen it was reckless" – constituted an affirmative waiver of the issue,[10] we conclude that McDaniel has failed to show plain error. This

---

[10] See *Thomas v. State*, __ Ga. __, __ (2) (__ SE2d __) (2021 Ga. LEXIS 293) (2021 WL 2194517) (Case No. S21A0395, decided June 1, 2021) ("An appellate court can conclude that a defendant waived his right to a particular instruction if the appellate court can discern a tactical reason on the part of the defense for failing to request (or object to, as the case may be) a specific jury instruction.") (citation and punctuation omitted);*Vasquez*, 306 Ga. at 229-230 (2) (espousing that affirmative waiver occurs for purposes of the plain error analysis articulated in *Kelly*, 290 Ga. 33, where "the defendant has invited the alleged error, and it therefore provides no basis for reversal") (punctuation and citation omitted), citing *United States v. Pravato*, 505

26

is precisely the type of "all or nothing" case expressly analyzed and distinguished by *Shah*. In this case, "[n]o instruction on reckless conduct as a lesser included offense was required [due to a lack of] evidence to support a finding of an intermediate level of culpability — that [McDaniel] harmed [B. F.] but did so *only through criminal negligence*." (Emphasis supplied.) *Shah*, 300 Ga. at 20 (2) (a), distinguishing *Banta v. State*, 282 Ga. 392, 398 (5) (651 SE2d 21) (2007) (finding charge on reckless conduct was not required, because if the jury believed the defendant's version of events, there was no conscious disregard of a substantial and unjustifiable risk that the defendant endangered the child's safety or caused his injuries, and under the State's evidence, the defendant maliciously caused the child's suffering).[11]

_____

F2d 703, 705 (2d Cir. 1974) (finding no plain error in erroneous jury charge where counsel failed to object because the defendant "was undoubtedly pursuing [a certain] trial tactic"). Accord *Szorcsik v. State*, 303 Ga. 737, 742 (4) (814 SE2d 708) (2018) (explaining that the defendant indicted for malice murder and felony murder had affirmatively waived a challenge to the court's failure to charge on voluntary manslaughter, because "when the trial court discussed giving a charge on [that offense] below, [the] defense team indicated that they did not want that charge given to the jury") (punctuation omitted).

[11] See also *Moon v. State*, __ Ga. __, ___ (2) (__ SE2d __) (2021 Ga. LEXIS 194, 2021 WL 1724954) (Case No. S21A0383, decided on May 3, 2021) ("[W]here evidence presented at trial shows the commission of a completed offense or the commission of no offense, the trial court is not required to charge the jury on a lesser included offense.") (citation and punctuation omitted); *Ferguson v. State*, 267 Ga. App. 374, 376-377 (2) (599 SE2d 335) (2004) (since the jury could accept either the

"Given that a charge of reckless conduct was inconsistent with [McDaniel's] theory of defense and was otherwise unsupported by the evidence, we find no obvious error in the trial court's failure to charge on that lesser included offense." *Clark v. State*, 348 Ga. App. 235, 247 (3) (820 SE2d 274) (2018). See *Stepp-McCommons v. State*, 309 Ga. 400, 404-405 (2) (b, c) (845 SE2d 643) (2020) (rejecting claim that the trial court erred in refusing to give charge on the lesser included offense of reckless conduct, where "the crimes were either committed as charged or not committed at all, and there was no evidence that [the defendant] was committing a non-felonious unlawful act"). Consequently, McDaniel has failed to demonstrate that plain error resulted from the refusal to give jury instructions on reckless conduct. See *Kelly*, 290 Ga. at 33 (2) (a); see also *Hill*, 310 Ga. at 194 (11) (a).

---

defendant's account indicating that neither the crime of cruelty to children nor the crime of reckless conduct was committed, or believe the State's evidence that proved the crime of cruelty to children, the trial court was not required to give the jury a charge on reckless conduct in the defendant's trial for child cruelty). See generally *Marshall v. State*, 276 Ga. 854, 858 (6) (b) (583 SE2d 884) (2003) ("When the evidence shows completion only of the greater offense, it is unnecessary for the trial court to charge on the lesser offense."); *Hoang v. State*, 250 Ga. App. 403, 410 (3) (551 SE2d 813) (2001) ("If any portion of a requested charge is inapt, incorrect, misleading, confusing, not adequately adjusted or tailored, or not reasonably raised or authorized by the evidence, denial of the charge request is proper."). Accord *Hafez v. State*, 290 Ga. App. 800, 804 (4) (660 SE2d 787) (2008).

28

4. McDaniel contends that the trial court erred by imposing upon her separate (albeit concurrent) sentences for the two counts of first degree child cruelty. She asserts that underlying both indicted counts was confining B. F. to the garage; that the distinction between the two counts – which she describes as the "temperature controlled" language in one count – constituted "only a descriptive aspect of the garage," and not an essential element of the crime; that the two counts of the indictment thus alleged either the same conduct or the same course of conduct; and that either way, the two counts should have been merged for sentencing purposes.

"'Merger' refers generally to situations in which a defendant is prosecuted for and determined by trial or plea to be guilty of multiple criminal charges but then, as a matter of substantive double jeopardy law, can be punished – convicted and sentenced – for only one of those crimes." *Scott v. State*, 306 Ga. 507, 509 (2) (832 SE2d 426) (2019); see *State v. Marlowe*, 277 Ga. 383, 383-384 (1) (589 SE2d 69) (2003). In cases involving two counts of the same offense, the merger analysis generally requires interpretation of the criminal statute at issue to identify the "unit of prosecution – the precise act or conduct that the legislature criminalized." *Scott*, 306 Ga. at 509-510 (2) (citations and punctuation omitted). "Where . . . the acts of [the same offense] alleged in different counts were part of a single course of conduct

29

occurring in a relatively short time frame, the unit of prosecution could determine if the defendant faces multiple . . . sentences or only one sentence." Id. at 510 (2).[12] And notably, the Supreme Court of Georgia recently reiterated that in some circumstances, wherein a defendant has been charged with multiple counts of the same offense such that a "unit of prosecution" question is normally triggered, no such analysis need be performed. See *Dukes v. State*, __ Ga. __, __ (4) (__ SE2d __) (2021 Ga. LEXIS 268) (2021 WL 1950913) (Case No. S21A0399, decided May 17, 2021) (concerning the effects of "the State's failure to make the timeframe of the [counts] material allegations within the indictment").

In the instant case, McDaniel was found guilty of two counts of first degree child cruelty. Pursuant to Georgia's statute proscribing that crime, the act or conduct prohibited is "maliciously caus[ing] a child under the age of 18 cruel or excessive physical or mental pain." OCGA § 16-5-70 (b). Accord *Busby v. State*, 332 Ga. App. 646, 651 (2) (b) (774 SE2d 717) (2015) (ascertaining a unit of prosecution for

---

[12] The Supreme Court of Georgia further instructed in *Scott* that "[w]here the acts [proscribed by the statute at issue] occurred in discrete incidents, precisely identifying the applicable unit may not affect the merger decision." *Scott*, 306 Ga. at 510 (2). In so instructing, the Supreme Court cited *Carver v. State*, 331 Ga. App. 120, 122 (4) (769 SE2d 722) (2015); *Metts v. State*, 297 Ga. App. 330, 336 (5) (677 SE2d 377) (2009). *Scott*, 306 Ga. at 510 (2).

purposes of the aggravated battery statute). In one count of the indictment, McDaniel was accused of "tying the victim up in the garage" "between the 1st day of January, 2018, and the 1st day of May, 2018, the exact date of the offense being unknown"; in the other count, she was accused of "keeping him in a garage which was not temperature controlled" during the same time frame.

In this case, however, the order entered on the motion for new trial reveals that the trial court neither engaged in the unit of prosecution analysis set out in *Scott*, nor considered whether circumstances such as those underlying *Dukes* existed such that the unit of prosecution analysis did not need to be performed. Instead, the trial court analyzed,

> The key question in determining whether a merger has occurred is whether the different offenses are proven with the same facts. In [one count of the indictment], the material act was tying up [B. F.], while in [the other count], the material element was keeping [B. F.] in the garage. [B. F.] testified that he slept in the garage, and "sometimes" his hands were tied when he was sleeping in the garage. Here, each of the counts asserts that different acts caused a different type of harm, and each required different evidence to prove harm. Therefore, this [c]ourt finds that Cruelty to Children in the First Degree [in one count] does not merge with Cruelty to Children in the First Degree in [the other count].

31

Employing such analysis to answer the merger question presented by this case was improper. *Scott*, 306 Ga. at 509-510 (2); see *Dukes*, __ Ga. at __ (4). And the appellate briefing likewise misses the mark. McDaniel argues, "If the State, in establishing the commission of the crime, relies entirely upon the same evidence used to establish a separate crime charged in the same indictment, as a matter of law the former charge is included in the latter." And the State counters,

> The State proved Appellant committed these offenses with different facts and different witness testimony, because different evidence was required to prove the separate charges. . . . The State was required to prove Appellant tied [B. F.] up in [one count] and that the garage was not temperature controlled in [the other count]. The fact that both acts occurred in the garage is not grounds for merger.

"It is important to conduct the applicable analysis, and [under the circumstances here,] it is appropriate for the [trial court] to do it in the first instance." *Scott*, 306 Ga. at 510 (2).[13] Hence, we vacate the sentences imposed upon McDaniel,

---

[13] See id. (where "[t]he Court of Appeals failed to engage in the applicable unit-of-prosecution analysis," remanding "the case for that court to determine and apply the unit of prosecution . . . to the merger issue presented").

and remand this case for proceedings not inconsistent with this opinion, including re-sentencing. See id.; see also *Dukes*, __ Ga. at __ (4).[14]

5. McDaniel contends that the trial court erred when denying her motion for a new trial, asserting that the trial court "fail[ed] to rule on [her] Request for Judicial Notice."

McDaniel explains that in anticipation of her new trial motion, she requested the trial court to take judicial notice that the night time temperatures during the time in question (January 1, 2018 through April 28, 2018) did not exceed 70 degrees. McDaniel cites that in support of her request, she provided the trial court with a website that reflected temperatures in the relevant area for that time period. According to McDaniel, such weather-related data was "highly relevant," because one of the indicted counts alleged that the garage lacked temperature control.

We find this challenge unavailing, as McDaniel has not shown that had the trial court taken judicial notice of the purported temperature data *at the motion for new trial stage*, she would have been granted reprieve from her convictions. See generally *Weems v. State*, 268 Ga. 142, 144 (5) (485 SE2d 767) (1997) (rejecting claim that the trial court erred by refusing to take judicial notice of weather conditions around the

---

[14] We express no opinion as to the outcome of McDaniel's re-sentencing.

time of the underlying crime, because among other things, the defendant "should have produced evidence in that regard [at the trial]"); *Davis v. State*, 283 Ga. 438, 446 (3) (D) (660 SE2d 354) (2008) (rejecting contention that defendant was entitled to a new trial, where contention advanced claim of new evidence, but the purportedly new evidence was "readily identifiable" before defendant's trial); see generally *Matthews v. State*, 268 Ga. 798, 803 (4) (493 SE2d 136) (1997) (reiterating that "harm as well as error must be shown for reversal").

*Judgment affirmed in part and vacated in part, and case remanded for re-sentencing. Gobeil and Markle, JJ., concur.*